# In the United States Court of Federal Claims

No. 14-1214C
(Filed:  February 23, 2015)*
**\*Opinion originally issued under seal on February 13, 2015**

<table>
<tr><td>

EQUA SOLUTIONS, INC.,

       Plaintiff,

v.

THE UNITED STATES,

       Defendant.
</td><td>

Bid Protest; FAR § 15.206(d); FAR § 15.306; Review of Price Evaluation
</td></tr>
</table>

*John C. Dulske*, San Antonio, TX, for plaintiff.  *Joan Kelley Fowler Gluys* and *Bryan L. Kost*, San Antonio, TX, of counsel.

*Eric E. Laufgraben*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Franklin E. White, Jr.*, Assistant Director.  *Erika L. Whelan Retta*, Air Force Legal Operations Agency, Joint Base Andrews, MD, of counsel.

**O P I N I O N**

**FIRESTONE**, *Judge.*

Pending before the court are cross-motions for judgment on the administrative record filed by plaintiff, Equa Solutions, Inc. ("Equa"), and defendant the United States ("the government"), in connection with the United States Air Force's ("agency") award of Contract Nos. F4887-14-D-0002, FA4887-14-D-0003, FA4887-14-D-0004, and FA4887-14-D-0005 to Herman Construction Group, Inc. ("Herman"), Rore, Inc.

("Rore"), Mirack & Macro-Z Technology ("M & M"), and Premier Engineering Corporation ("Premier").  In its complaint filed under 28 U.S.C. § 1491(b), Equa alleges: (1) the Air Force conducted improper discussions when it issued an amendment to the solicitation but failed to inform Equa that there were material defects in its proposal that jeopardized its chance at an award, and (2) the Air Force's finding that Equa's price proposal was unacceptable was not rational.  For the reasons that follow, the court finds that Equa's challenges to the contract awards must be rejected and that the defendant is entitled to judgment on the administrative record.

## I.      Statement of Facts

### A.      The Procurement

At issue in this case is a Multiple Award Construction Contract ("MACC") Indefinite-Delivery Indefinite-Quantity for Luke Air Force Base in Glendale, Arizona. Administrative Record ("AR") 1447, 1625.  Under the terms of the MACC, contractors are to furnish all plant, labor, material, equipment, transportation, and supervision necessary to accomplish each task order in accordance with the contract, specifications, and additional terms and conditions.  Id.  The solicitation, RFQ FA4887-13-R-0005 ("Solicitation"), was posted to Federal Business Opportunities website on June 20, 2013 with an original closing date of July 30, 2013.  Id. at 118.

### 1.      The Evaluation Provisions

The evaluation process was set out in Section M(C)(1) of the Solicitation which stated that "[e]ach step of this process is codependent upon the step immediately preceding; the government will only rate those proposals in Step 2 [Price of

Demonstration Project] that were deemed Acceptable in Step 1 [Technical Acceptability]. At the conclusion of Step 2, the government would evaluate Past Performance of the lowest priced acceptable offerors, assign a Past Performance Confidence rating and continue in succession based on price assigning Past Performance Confidence ratings." Id. at 189. Accordingly, a technical proposal that was "Unacceptable" in Step 1 would not be evaluated in Step 2; in turn, a price proposal that was not complete, reasonable, and realistic in Step 2 would not be evaluated for past performance in Step 3. Id.

With respect to the price evaluation performed in Step 2, the Solicitation provided that proposals would be evaluated in three ways. First, the Air Force would determine whether the price submission was complete, providing "[a]ll information/data required by the solicitation" and that all information received was free of omissions or errors. Id. at 186, 189. Second, prices would be evaluated for reasonableness; that is, the total price "represents an amount that a prudent person would pay in a competitive business environment." Id. at 186. Third, the agency would determine whether the price proposal was realistic. Section M(B)(1)(b)(i) and Section M(B)(3)(d) of the Solicitation provide that "[r]ealism is based on the items of the demonstration project price proposal to determine whether prices are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the various elements of the offeror's technical proposal." Id. The Solicitation provided that "[u]nrealistically low or high prices may be grounds for eliminating a proposal from competition on the basis that the offeror does not understand the requirement." Id.

3

The Solicitation also stated that the "Government intends to evaluate proposals without discussions with offerors.  Therefore, it is imperative that each offeror submit their best terms with their initial proposal . . . .  Offerors will not assume that they will be contacted or afforded an opportunity to qualify, discuss or revise their proposals." Id. at 173-74.

### 2.      Amendments 0005 and 0006 Remove Design and Other Work from the Scope of the Demonstration Project

The Air Force issued eight amendments to the Solicitation before proposals were due.  Of particular significance to this protest are Amendments 0005 and 0006, dated July 18, 2013 and July 23, 2013, respectively, which changed the scope of the demonstration project from a design-build project to a 100%-designed project.  Id. at 193.2911; see also id. at 193.2959 ("The demonstration project is fully designed and not a design-build project.  There should be [n]o added design fees"); id. at 193.2961 ("The demonstration project is fully designed and should not be considered a design-build effort").  The purpose of eliminating the design work was "[t]o ensure the evaluation of all proposals are the same and fair[.]"  Id. at 193.2962.  In addition, sprinkler work was also removed from the scope of the demonstration project.  Id. at 193.2959 ("[T]here is no work to the Fire Sprinkler System").  The Solicitation closing date was extended to August 5, 2013 to account for these and other changes.  Id. at 233.

### B.      Prior to Award, The Air Force Amended Its Solicitation to Require Bidders to Provide Updated Resumes and Verify Pricing

The Air Force received twenty-five proposals and anticipated issuing awards by December 3, 2013.  Id. at 118, 233, 1447.  The evaluation process was completed in a

4

timely manner but, because of the sequestration and furloughs of government personnel in the Fall of 2013, the contracts were not awarded.  Id. at 1961.  Because of the delay between the evaluation and any award, the Air Force issued Amendment 0009 on April 23, 2014, requesting offerors to verify that their prices had not changed or provide updated pricing with a detailed explanation underlying the changes.  Id. at 242-43.   The offerors were also asked to resubmit resumes of key personnel to account for any changeover in employment.  Id.  Offerors were instructed to respond to Amendment 0009 by April 30, 2014.  Id.

### C.    Equa's Pricing Proposal Was Found Unacceptable

Equa's proposal was one of thirteen proposals found to be technically acceptable during Step 1 of the evaluation process conducted after April 30, 2014.[1]  Id. at 5925.  However, Equa's price proposal was determined to be unacceptable and thus Equa's proposal was not considered in Step 3.  Id. at 1411-12, 5925.  Specifically, the price evaluation provided the following breakout:

| DESCRIPTION | YES | NO | NOTES |
|---|---|---|---|
| Completeness: Did the offeror provide all information/data required to render the price as complete? | | X | The offeror failed to correctly price the mechanical equipment, which is the largest priced item of the demonstration project.  The offeror failed to price the APC server rack, distributed processing unit (DPU) module, and other networking items along with any design fees including asbuilts.  The offeror provided lump sums and not |

---

[1] During the second evaluation, proposals were reevaluated if offerors submitted revised information in response to the amendment.  As Equa did not submit any revised information, the previous evaluation appears to have been used again for the second evaluation.

| | | | |
|---|---|---|---|
| | | | sufficient detail to demonstrate price reasonableness.  The offeror's calculations were not accurate.  The offeror failed to complete columns 4 (Unit), 6 (Manhours), 7 (Avg Rate), and 9 (ODC) of the required AF form 3052 |
| Price Reasonableness: Reasonableness is based on the total evaluated price compared to historical prices for similar efforts, comparison to the Independent Government Estimate (IGE), and price competition obtained by the other offerors' proposals submitted in response to this RFP.  Did the offeror provide a reasonable price that a prudent person would pay in a competitive business environment? | | X | The offeror excluded crucial other direct costs.  The offeror's price was [ . . . ]% lower than IGE and [ . . . ]% lower than the average of the Technically Acceptable offerors. |
| Price Realism: Did the offeror provide a Realistic price based on the items of the demonstration project for the work to be performed, reflect a clear understanding of the requirements, and are [sic] consistent with the various elements of the offeror's technical proposal? (Unrealistically low or high prices may be grounds for eliminating a proposal from competition on the basis that the offeror does not understand the requirement.) | | X | The offeror did not reflect a clear understanding of the requirements.  The offerors [sic] price was based from a 100% design and was not consistent with offeror's technical proposal.  The offeror failed to price design in accordance with their technical approach.  This would explain the missing ODC. |

Id. at 1411-12; see also id. at 297, 1179-82.

The Solicitation directed offerors to "provide a price breakdown for the demonstration project by providing a completed Construction Cost Breakdown (Attachment 14)." Id. at 175; see also id. at 193.1234-.1237.  The instructions to offerors explained that "[t]he purpose of [using AF Form 3052] is to provide a standard format by which the offeror submits to the Government a summary of incurred and estimated costs (and attached supporting information) suitable for detailed review and analysis." Id. at 193.1237.  Although Equa did not make a formal or informal complaint regarding the information requested or the requirement to use the AF Form 3052, Equa removed columns 2 (unit of measure) and 3 (quantity of materials), and left out information called for by columns 4 (units of materials to be supplied), 6 (manhour/mandays), 7 (average wage rates), and 9 (other direct costs). Id. at 297.  Equa submitted only lump sum figures for labor and materials. Id.

Equa's price proposal was also complicated by the fact that it presented its technical approach as a design-build effort even though the Solicitation, as amended, specified that design work was no longer required. See id. at 193.2959.  Equa, however, failed to explain how its technical proposal and price proposal should be read together, stating only that "[Equa's] technical approach narrative and schedule for the Demonstration Project assumes that the project is 35% designed and requires design-build services for completion of all requirements.  The costing for the Demonstration Project presented in Volume II is based on 100% design documents and includes no design fee." Id.  The Air Force ultimately determined that it was not possible to evaluate Equa's prices because, without understanding how the cost of design played into the

project costs, it could not evaluate the real cost of Equa's proposal.  Relatedly, Equa

included sprinkler work in its technical proposal, but did not address where that cost

appeared in its price proposal.  The Air Force further noted that Equa's "calculations

were not accurate" in that certain figures in its proposal did not add up.  Id. at 1411.

Specifically, the figures in the Line Totals add up to $[ . . . ], but the Construction Cost

Estimate Breakdown indicates a Total Base Bid of $[ . . . ], which is $[ . . . ] less.  Id. at

297.  Based on these deficiencies in Equa's Construction Cost Estimate Breakdown, the

Air Force determined that Equa's price proposal was incomplete, unreasonable and

unrealistic, and thus its proposal was not evaluated further.  Id. at 1411-12.

In contrast to Equa, ten of the other 13 offerors that made it to Step 2 were found

to have complete, reasonable, and realistic prices.  Those offerors' proposals were

evaluated in Step 3. In accordance with the Solicitation's evaluation procedure, these

offerors were ranked from lowest to highest based on total price and were then evaluated

for past performance.  Id. at 5926.  On July 28, 2014, at the conclusion of the past

performance evaluation, the Air Force made awards to Herman, Rore, M & M, and

Premier, the four offerors with the lowest total evaluated prices that also received a

Substantial Confidence rating for past performance.  Id. at 1441.  Equa was notified of

the decision and received the requested debriefing.  Id. at 1824; 1860.

### D.    The GAO Protest

Equa filed a protest at the Government Accountability Office ("GAO") on August

15, 2014, followed by a supplemental protest on August 22, 2014, challenging the Air

Force's awards to Herman, Rore, M&M, and Premier.  Id. at 2016, 2043.  In its protest,

Equa alleged that Amendment 0009, which requested that offerors verify their prices or provide updated pricing with a detailed explanation underlying the changes and that offerors resubmit resumes of key personnel to account for any changeover in employment, id. at 242-43, was, in fact, a call for discussions pursuant to FAR § 15.306(d).  According to Equa, because there were discussions, the Air Force should have informed Equa that the Air Force's initial review of Equa's price proposal prior to Amendment 0009 identified deficiencies that, if corrected, would have increased its chance for award.  Id. at 2030.

The GAO rejected this argument, finding that Amendment 0009 did not constitute a discussion because, among other things, the Air Force "uniformly allowed offerors to resubmit resumes of their key personnel, to verify that unit prices were still current, and if not, to provide a detailed justification of changes, and to extend the proposal acceptance period" and did not (1) communicate with offerors regarding the contents of their proposals, (2) ask any questions or seek information from offerors concerning areas of concern in their proposals, (3) negotiate with any offerors, or (4) establish a competitive range.  Id. at 5967-68.  According to the GAO, Amendment 0009 did not reflect any of the "ordinary indicia of discussions[.]"  Id. at 5967.

In its supplemental protest before the GAO, Equa challenged the merits of the Air Force's evaluation of its price proposal.  Id. at 2045.  The GAO rejected that challenge on the grounds that Equa had failed to show that the Air Force's decision was irrational.  Id. at 5965-66.  With regard to Equa's argument that its prices were made up of subcontractor costs, and thus it did not possess the information required to complete the

cost estimate breakdown, the GAO found that Equa did not provide any explanation for why it could not obtain that information from its subcontractors.  Id. at 5965.  The GAO also noted that the Solicitation required the breakdown to be completed.  With regard to the price realism evaluation, the GAO found that it was within the agency's discretion to consider consistency between the price and technical evaluation in determining price realism.  Id. at 5966.  The GAO concluded that it was rational, based on the disconnect between the price and technical proposal and the other deficiencies in the price proposal, to determine that the price was not realistic.  Id.

Equa filed a complaint in this court on December 18, 2014, approximately one month after the GAO's decision.  Briefing was completed on February 2, 2015 and oral argument was heard on February 6, 2015.

## II.     DISCUSSION

### A.     Standard of Review

The standard of review in bid protest cases is well-established. The court will uphold an award decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  To prevail, the protester must demonstrate that either (1) the agency's decision was irrational, id. at 1351, or (2) the agency violated a regulation or procedure in a manner that significantly prejudiced the protester, Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009). Where a protester seeks to demonstrate that the award decision was irrational, it must demonstrate that the agency's exercise of discretion lacked any "coherent and reasonable

explanation." Banknote, 365 F.3d at 1351.  This standard is "highly deferential," Weeks
Marine, 575 F.3d at 1368-69, and a plaintiff "bears a heavy burden of showing that the
award decision had no rational basis," Banknote, 365 F.3d at 1351.  Where a rational
basis exists, the court shall not substitute its judgment for that of the agency, "even
though it might, as an original proposition, have reached a different conclusion as to the
proper administration and application of the procurement regulations." Honeywell, Inc.
v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (citing M. Steinthal & Co. v.
Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

Pursuant to this standard, an agency's procurement decisions are entitled to a
"presumption of regularity," and "the agency's action must be upheld as long as a
rational basis is articulated and relevant factors are considered." Emery Worldwide
Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (citations omitted);
Orion Tech., Inc. v. United States, 704 F.3d 1344, 1351 (Fed. Cir. 2013) ("Agencies are
entitled to a high degree of deference when faced with challenges to procurement
decisions.  A protestor . . . may only prevail when it is clear that the agency's
determinations are irrational and unreasonable." (citations omitted)) (citing R & W
Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003); Impresa
Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed.
Cir. 2001)).

In reviewing a motion for judgment upon the administrative record pursuant to
Rule 52.1 of the Rules of the United States Court of Federal Claims, the court must
decide whether, given all the disputed and undisputed facts, a party is entitled to

judgment based upon that evidence.  A&D Fire Protection, Inc. v. United States, 72 Fed.

Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir.

2005)).  In sum, in order to set aside a procurement decision, the protestor has the heavy

burden of establishing that: (1) the procurement official's decision "had no rational

basis;" or (2) there has been a "clear and prejudicial violation of applicable statutes or

regulations."  Centech Group v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009)

(quoting Impresa, 238 F.3d at 1333).

### B.    Amendment 0009 Did Not Call For Discussions Under FAR § 15.306(d)

In negotiated procurements, amendments to solicitations are governed by FAR §

15.206.  See 48 C.F.R. § 15.206.[2]  Under the terms of § 15.206, amendments may be

issued after proposals are received and even after proposals have been evaluated in

certain circumstances.  Specifically, an agency may amend a solicitation after an initial

round of evaluations "where the record shows that the agency made the decision to take

this action in good faith, without the specific intent of changing a particular offeror's

---

[2] The provision states, in relevant part:

    (a)    When, either before or after receipt of proposals, the Government changes
            its requirements or terms and conditions, the contracting officer shall
            amend the solicitation.
    (b)    Amendments issued before the established time and date for receipt of
            proposals shall be issued to all parties receiving the solicitation.
    (c)    Amendments issued after the established time and date for receipt of
            proposals shall be issued to all offerors that have not been eliminated from
            the competition.

48 C.F.R. § 15.206.

technical ranking or avoiding an award to a particular offeror." Mantech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 73 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002) (quoting Fed. Sec. Sys., Inc., B-281745.2, 99-1 CPD ¶ 86, at 5, 1999 WL 292729 (Comp. Gen. Apr. 29, 1999)).

In addition to authorizing solicitation amendments, the FAR also authorizes agencies to conduct discussions with certain offerors pursuant to FAR § 15.306(d).[3]

---

[3] The provision states:

Exchanges with offerors after establishment of the competitive range. Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

(1)   Discussions are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range.

(2)   The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.

(3)   At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

(4)   In discussing other aspects of the proposal, the Government may, in situations where the solicitation stated that evaluation credit would be given for technical solutions exceeding any mandatory minimums, negotiate with offerors for increased performance beyond any mandatory minimums, and the Government may suggest to offerors that have

Section 15.306(d) permits individualized negotiations with offerors "to maximize the Government's ability to obtain best value" in a procurement.  48 C.F.R. § 15.306(d)(2).  Under the § 15.306(d), discussions occur after the establishment of a competitive range of bidders.  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1318 (Fed. Cir. 2003) ("if the agency decides to hold discussions, however, it must first establish a competitive range 'comprised of the most highly rated proposals.'" (quoting 48 C.F.R. § 15.306(c)(1)).  In this context, "'discussions involve negotiations' and 'are undertaken with the intent of allowing the offeror to revise its proposal.'"  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1332 (Fed. Cir. 2004) (quoting Info. Tech., 316 F.3d at 1321).

Equa argues that the Air Force violated § 15.306(d) because Amendment 0009 was "'undertaken with the intent of allowing the offeror to revise its proposal' and . . . [thus Amendment 0009] constituted 'discussions' within the meaning of the FAR and Federal Circuit precedent."  Pl.'s Mot. 10.  Under these circumstances, plaintiff argues,

---

exceeded any mandatory minimums (in ways that are not integral to the design), that their proposals would be more competitive if the excesses were removed and the offered price decreased.

(5)     If, after discussions have begun, an offeror originally in the competitive range is no longer considered to be among the most highly rated offerors being considered for award, that offeror may be eliminated from the competitive range whether or not all material aspects of the proposal have been discussed, or whether or not the offeror has been afforded an opportunity to submit a proposal revision (see 15.307(a) and 15.503(a)(1)).

48 C.F.R. § 15.306(d).

the agency was obligated to inform Equa of deficiencies in its proposal and permit it the opportunity to make it more competitive.  Plaintiff argues that the amendment, in conjunction with the accompanying memorandum and emails, constituted an implied invitation to offerors to negotiate with the government by offering more competitive prices.  Plaintiff contends that the agency purposefully crafted an open-ended amendment in order to permit offerors to revise their proposals beyond the purported scope of the amendment.  While it is undisputed that no actual discussion or negotiation between the government and any offeror appears to have occurred, plaintiff contends that the fact that several offerors took the opportunity to revise their proposals caused the process to take on the characteristics of discussions.  Further, plaintiff argues that the initial selection decision created a de facto competitive range, which is a prerequisite to holding discussions.

In response, the government argues that Amendment 0009 did not amount to "discussions" within the meaning of § 15.306(d) because it only allowed offerors the opportunity to update their pricing information and personnel submissions due to delays in the procurement process and had nothing to do with selecting an awardee after a competitive range decision.  In this connection, the government also argues that Amendment 0009 could not constitute "discussions" because it was limited to asking all offerors to update their price and personnel-related information only and did not address any aspect of an offeror's technical proposal.  The government notes that offerors were not permitted to make changes to any other portion of their proposals and all offerors were given the same opportunity to submit their changes, regardless of their ranking.

15

Finally, the government argues, Amendment 0009 did not call for discussions, because the Solicitation expressly stated that "[t]he Government intends to evaluate proposals without discussions with offerors," AR 173, and that the administrative record establishes that no discussions were conducted with any offerors.[4]  In such circumstances, the government concludes, Amendment 0009 did not fall within the terms of FAR 15.306(d).

The court agrees with the government that Amendment 0009 did not trigger the discussions provisions of the FAR and thus the Air Force did not err in failing to identify to Equa "significant weaknesses, deficiencies, and other aspects of its proposal . . . to materially enhance [Equa's] potential for award.'"  It is clear that Amendment 0009 was not issued after a competitive range determination or for the purpose of allowing the Air Force to make a best value decision.[5]  Rather, the court finds that Amendment 0009 met the criteria of FAR § 15.206 and was therefore lawful.  As discussed above, the Air Force was authorized under FAR § 15.206 and established precedent to seek updated price and

---

[4] Equa initially cited certain updates made to Rore and Premier's proposals in support of its claim that the Air Force conducted unfair discussions.  However, the record shows that Rore and Premier were provided with the same information and instructions that Equa and all other offerors received in connection with Amendment 0009.  AR 1146-50.  At oral argument, Equa agreed that no such discussions appear to have occurred.

[5] Equa's contention that a de facto "competitive range" determination was created because the agency had conducted an initial evaluation prior to issuance of the Amendment is unfounded.  Specifically, plaintiff contends that all offerors were considered to be within the competitive range and the agency then issued the amendment as an attempt to get offerors to improve their bids.  However, the record indicates that while Amendment 0009 was issued after the initial evaluation—during which some offerors, including Equa were determined to have submitted inadequate bids—the amendment was nonetheless sent to original offerors who were considered to be inadequate during the initial evaluation.  See AR 1146-48.  As a result, the contention that the initial evaluation created a competitive range is unsupported by the record.

personnel information from all offerors after there had been an initial evaluation process. Here, the Air Force had a good faith reason for doing so: the delay between the offerors' initial submissions and the award decision.  The record demonstrates that all offerors were given the same opportunity to respond and there is no evidence that the request was made to aid any specific offeror.  Further, it is undisputed that there is no evidence in the record that any actual conversations occurred.  While plaintiff argues that the actions of the offerors and the agency effectively created a negotiation, the court finds no evidence of back-and-forth.  Additionally, there is no evidence in the record that the agency wished to receive more competitive bids in response to the amendment.  Indeed, one of the awardees raised its bid in response to the amendment, AR 1138, while an offeror that lowered its prices to become more competitive was not selected, id. at 780.  Where, as here, the amendment applied to all offerors and was not designed to improve the chances of any particular offerors, the amendment was lawful and did not trigger the right to discussions under § 15.306(d).[6]  See Galen, 369 F.3d 1332-33.

### C.   The Air Force's Evaluation Of Equa's Price Proposal Was Not Irrational Or Unlawful

Equa argues that, even if the Air Force did not have to inform Equa of potential deficiencies in its price proposal, an item-by-item comparison of its proposal with the

---

[6] To the extent that plaintiff contends that Amendment 0009 was overbroad in that it did not prohibit offerors from otherwise revising their bids, thereby making it an impermissible amendment under the FAR, plaintiff has waived this argument by failing to object to the language of the amendment before the issuance of a decision.  COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012) ("But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract.")

awardees' proposals demonstrates that the Air Force had sufficient information to make an informed decision regarding Equa's prices and that it was not rational to eliminate Equa from the competition on the grounds that Equa's price proposal was inadequate. Specifically, Equa argues that the Air Force applied a more stringent standard to its evaluation than it did to other offerors.  In support for this contention, plaintiff points to the agency's evaluation of Rore and Herman.  First, while Equa does not dispute that it did not fill out required rows on AF Form 3052, it contends that the agency did not raise any concerns that Rore had failed to complete certain other aspects of the form.  Second, while Equa does not dispute that its price and technical proposal did not match, it contends that it was required by the terms of the Solicitation to submit inconsistent proposals.  Third, Equa argues that it was irrational for the agency to find that its prices were unrealistic as too low, arguing that its price proposal documented the costs properly.

In response, the government argues that the agency's evaluation was rational because no other awardee's proposal contained the level of errors that Equa's did.  The government argues that, as a whole, these errors made it impossible for the Air Force to confidently evaluate plaintiff's price proposal, forcing it to find the proposal inadequate. Regarding AF Form 3052, the government argues that Equa's omissions removed necessary context for prices that other offeror's proposals, while still not entirely complete, nonetheless provided.  Further, the government argues that the complete omissions of the columns demonstrated to the Air Force that Equa might not understand the requirements, while other offeror's proposals were complete enough to demonstrate that they did understand the requirements.  Regarding the consistency of price and

technical proposals, the government argues that Equa is incorrect in its argument that the price and technical proposals were required to be inconsistent, considering that the Solicitation was amended to instruct the offerors to assume that there would be no design requirement for the demonstration project.  Regarding how realistic Equa's prices were, the government argues that the inconsistency of plaintiff's proposal made it impossible to evaluate this element, and other missing information forced the agency to make multiple levels of assumptions resulting in a finding of inadequacy.

The court agrees with the government.  Based on a review of the record, it is clear that Equa's proposal, on the whole, contained substantially more errors and omissions than those submitted by the awardees.  Indeed, the comments in the Air Force's evaluation of Equa's price proposal make clear that the agency was unable to evaluate the proposal with the materials provided.  See AR 1411-12.  The record does not support plaintiff's contention that Equa was penalized for the same problems that were overlooked in the case of the awardees.  Because Equa's proposal lacked information, was inconsistent, and arrived at a price that was not realistic, the Air Force rationally concluded that it was inadequate.

Regarding the omissions on AF Form 3052, the Solicitation specified that "[o]fferors shall provide a price breakdown for the demonstration project by providing a completed Construction Cost Breakdown (Attachment 14).  Offer will be complete, accurate, and sufficiently detailed to demonstrate price reasonableness and realism, a clear understanding of the requirement, and be consistent with the offeror's technical proposal."  AR 175.  As set forth in the Air Force's Proposal Analysis Report, Equa

failed to satisfy this requirement because its price proposal on AF Form 3052 was incomplete and lacked detailed documentation for the agency to adequately evaluate the price proposal.  Id. at 1411-12; see also id. at 297-98, 1877.  Equa does not dispute that its proposal did not conform with AF Form 3052.  Rather, it argues that its proposal was "adequate" because the price proposals for certain awardees reflected similar deficiencies.  In particular, Equa argues that Rore failed to provide values for materials or labor for certain elements of their price proposal.  The court finds from its review of the record that none of the awardees' proposals contain the number of flaws present in Equa's proposal and thus Equa has failed to show how the Air Force's decision to find its price proposal unacceptable for lack of completeness and detail was irrational.  While Rore did not provide certain values, it did provide unit costs, manhours, and wage rates for other elements.  AR 1082.  Equa, on the other hand, did not provide any values for unit costs, manhours, or wage rates.  AR 297.

Indeed, Equa disregarded the instructions attached to AF Form 3052 with respect to Columns 4, 6, 7, and 9, and did not include the requested information.  Without the basic information underlying the figures that Equa provided for its labor or materials costs, it was not possible for the Air Force to determine the anticipated hours, units or rates that underlie those figures.  See id. at 298, 1971.  Equa argues that this is not true, stating that the Air Force had all of the data it actually needed to make a decision.  However, the government argues in response that this information was necessary to show—in addition to the costs for labor and materials—that the offeror understood the amount of time, as well as the costs for labor, materials and other costs, required to

complete the demonstration project.  The court will not second guess that conclusion here.  Honeywell, 870 F.2d at 648.

Further, the Air Force noted that Equa's Construction Cost Estimate Breakdown did not conform to AF Form 3052 because Equa had entirely eliminated Columns 2 (Unit of Measure) and 3 (Quantity), from the form and thus the Air Force lacked any underlying detail for the material costs.  Compare AR 193.1234 with AR 297.  A review of the record reveals that all of the awardees did not eliminate columns from the form and thus the Air Force had the underlying details for their proposals.  See id. at 471-72 (Herman), 828-29 (M&M), 954-57 (Premier), 1139-42 (Rore).

Regarding the consistency of the technical and price proposal, the Air Force determined that this price was not realistic, primarily, because Equa failed to account for items specified in its technical proposal, such as design costs, fire sprinkler cost elements and network equipment cost elements.  See id. at 1877.  Equa's technical proposal "assume[d] that the project is 35% designed and requires design-build services for completion of all requirements."  Id. at 260.[7]  Nonetheless, Equa's price proposal did not include any prices for those required services and was prepared as if it were "based on 100% design documents and include[d] no design fee."  Id.  In addition, Equa's technical proposal references subcontracting sprinkler installers, but the price proposal does not reflect any costs for those services.  Id. at 265, 298.  Based on these discrepancies

---

[7] Although the Air Force found that Equa's technical proposal was adequate, it does appear that Equa failed to recognize that in various amendments to the Solicitation the Air Force had informed offerors that the project was 100% designed and that sprinklers would not be required.

between the technical proposal and the price proposal, the Air Force determined that

Equa's price proposal was unrealistic because it did not "reflect a clear understanding of

the requirements, and [was not] consistent with the various elements of [Equa's]

technical proposal." Id. at 186.

Equa argues that it included these elements as part of its technical proposal "to

show that Equa understood that fire protection work is typically required in a renovation

such as the one contemplated by the Demonstration Project" and because "Equa

understood future task orders issued may require Equa to perform varying

degrees of design work." Id. at 193.2959; Pl.'s Mot. 22-23.  However, Equa's argument

misses the point.  The Air Force determined that it could not evaluate Equa's proposal

because the Air Force could not determine how the costs implicit in its technical proposal

figured into its price proposal.  The court finds the Air Force's conclusion regarding this

discrepancy rational.  At bottom, Equa's price proposal was inconsistent with its

technical proposal and was properly rejected on that basis.

For the same reasons, Equa's claims regarding the proposals submitted by Herman

and Rore do not undermine the Air Force's determination.  Herman and Rore submitted

technical proposals and price proposals that assumed 100%-designed projects.  Compare

AR 260 (Equa) ("Equa Solutions, Inc.'s technical approach narrative and schedule for the

Demonstration Project assumes that the project is 35% designed and requires design-

build services for completion of all requirements") with id. at 428 (Herman) ("Since this

project is 100% designed we have not included any design-related elements in this

narrative"), 1043 (Rore) ("The project is a Build project and requires no significant design efforts").

Regarding the realism of Equa's price proposal, Equa presents a Line Item Pricing Comparison Chart and an accompanying narrative, which purports to show that the line items in its own proposal are often higher than certain line items in the proposals of the awardees. Id. at 29-33. Leaving aside the fact that Equa's figures do not add up correctly, Equa's price proposal reflects a total estimated project price of $[ . . . ], AR 298, whereas the IGE projected a price of $[ . . . ], AR 2. According to Equa, this demonstrates that the price proposed, while low, was supported by the documentation provided. However, the Air Force did not find the price to be too low because it was unsupported, but rather found Equa's price for the demonstration project to be unrealistically low because it did not include the costs of design build services even though its technical proposal stated that the design project was only 35% complete. AR 265, 298, 1412. Because the Air Force had to assume that design costs were missing, it was not irrational for it to conclude that it was not possible to compare Equa's prices with the prices offered by others and the IGE.

While these individual elements may have independently been sufficient for the agency to find the price proposal to be inadequate, the combination of all three led the agency to rationally conclude that it was not able to properly evaluate the proposal, and therefore found it inadequate.

## III.   CONCLUSION

For all of these reasons, the court **GRANTS** the government's cross-motion for judgment on the administrative record and **DENIES** Equa's motion for judgment on the administrative record.[8]  The clerk is directed to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**


s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[8] Having concluded that Equa's motion must be denied, the court has no occasion to rule on Equa's request for injunctive relief.